I would like to reserve five minutes for rebuttal. Let's see if you get that much. I'll be tracking, but you may not end up with that. Thank you, Your Honor. May it please the Court, Seth Rau for appellant at the Oregon Clinic. This Court should, under de novo review, reverse the District Court's grant of Fireman's Fund's motion to dismiss and remand to allow the Oregon Clinic to proceed with discovery or at least amendment of its complaint, or should certify the question in our motion for certification to the Oregon Supreme Court. Your Honors, if I may, I think rather than follow my script, I'd like to address some of the questions that you just asked counsel in the preceding argument. One question was about are there any cases in the Oregon State Court system percolating their way up to the Oregon Supreme Court, and the answer is no. I've been keeping careful track with my firm of cases in Oregon State Courts, and there are none working their way up. Oregon is a state with very few domestic insurance companies, and so as a result, all of the cases that I've seen involving this issue were removed to federal court. One of the first questions that you asked was what is different about Oregon? Is there anything different about Oregon law that would suggest that the Oregon Supreme Court would decide this question differently than courts of appeals? Hold on a second. The clock's not moving, so I think I would just want to... Oh. Thank you. It's okay. The answer is the Trutanich case from the Oregon Court of Appeals from 1993. That is different. In the Trutanich case, the court found that methamphetamine odors that had pervaded a rental home because it had been used as a drug lab constituted direct physical loss or damage. The federal district courts here have struggled to distinguish Trutanich from the cases before them. They have mostly been able to do so with little problem because most of the cases decided by the Oregon federal district courts have only alleged that the direct physical loss or damage was the governmental orders. They did not allege that the virus was on the premises. The Oregon Clinic's complaint, like Narasuta's complaint, alleges that the virus was on the premises and that it damaged the premises or caused direct physical loss, and those are two different terms, much as the methamphetamine odors in Trutanich were found to have damaged the home. So the appellant in the last case basically agreed that direct physical loss or damage requires physical alteration. Are you agreeing to that or conceding that? No, Your Honor, I certainly do not agree with that. In Trutanich, the Oregon Court of Appeals relied on the Western Fire case from Colorado. In the Western Fire case, the court found that gasoline vapors, which had permeated a church, were direct physical loss or damage. The physical alteration construct was invented by the authors of the Couch Third Treatise, out of whole cloth, essentially. They cited Western Fire as contrary authority for the physical alteration standard. In Trutanich, the Oregon Court of Appeals adopted Western Fire, therefore rejecting the physical alteration standard. Now, we contend that the Oregon Clinic has alleged alteration of its premises by the presence of the virus. The key distinction may be that I believe some courts think when they say alteration, they mean permanent alteration. In other words, an alteration that, unless someone does something, will remain on the property. If that is their interpretation of alteration, I believe that to be incorrect. It's not supported by the policy, any language in the policy. Well, it seems to me that there is just an inherent difference between the meth case and the gasoline odor case and COVID, and that is that, I mean, methamphetamine residue in a structure can lead to condemnation. Like, it's not, like, people should not be in that environment. Their health is at risk just being in that environment, similar to gas vapors. Like, you could have, you could be ill, you could have serious consequences. That's not the same, and that's pointed out by, in the last case, the argument that, you know, even though COVID is everywhere, grocery stores are operating, and places are operating, or, you know, pursuant to government orders, operating in a new way, perhaps. But it's not the same in terms of, like, you just can't be there because your health is immediately at risk in the way that the meth and the gas vapor cases are. So how do you get around that reality? Well, Your Honor, I think it's helpful to take us back to March of 2020 when we didn't know about the virus, but what we knew was that people were dying because they were exposed to the virus. That's different now. We have vaccines now. We have a better understanding of the virus. At the time, what the public health officials and the scientists and epidemiologists that we cited in our complaint knew was that this was a lethal virus. Now, the government made and businesses made decisions about mitigating damage. People still had to get groceries. People still had to have essential medical services. However, that doesn't mean that it was safe to be in a place where there was COVID at all. Well, but even, I mean, I'm not sure that the analogy, like, there's still a distinction between the two categories of cases because it comes down to what the government's decided to do in terms of reacting to this public health situation, even in those early days. And the immediacy in terms of exposure is just not the same. I believe that's a factual question, honestly, Your Honor. I mean, the science that existed at the time after the coronavirus came out suggested that 15 minutes of exposure to it could lead to fatal, potentially fatal consequences in someone who is immunocompromised. So your clients are in the medical field where you're going to be really sensitive about these things in a different way than a restaurant is. So did your clients just shut the doors, period? We're just, you know, we think that there's an immediate risk in that way, similar to a gas vapor or a meth situation, so we're just not going to do this? We couldn't shut our doors. We were not allowed to completely shut our doors. But we did make decisions based on the science at the time. And so— And doesn't that illustrate my point, that in these other circumstances, you couldn't just say, well, we're going to weigh the risks and the benefits and go forward. Maybe we'll wear a mask. No, in those other circumstances, it's not an option. You're not in that space. The distinction that I would agree with is that in those cases, the buildings could be evacuated, but people still had to go in to remediate the problem that was there, the gasoline vapors, the methamphetamine odors, et cetera. Right, but not to go on and carry on whatever activities happened in those structures. In our complaint, we did allege the modifications that we had to make, physical modifications, policy modifications. We had to limit the usage of our facilities. So those were the changes that we made to try to be able to offer essential medical services at the same time as the science was telling us we could not simply operate as normal. Counsel, I mean, I understand that I'm not a scientist. This might be a factual issue, but my basic understanding of, you know, meth or smoke is that it is essentially altering the physical property in the way that smoke damage or something where it is essentially gotten into the physical property in a way that can't be remedied just by cleaning. But my understanding, my lay understanding of all the allegations in the complaint is, although COVID required, you know, measures, right, to prevent spread, they were largely, when it comes to physical property, it could be dealt with by cleaning, not repair or replacement in the same way that you would have to replace something that suffered smoke damage. So are you alleging that that sort of those cleaning, just the fact that something is physically on top of another, the virus physically on top of something and had to be cleaned, satisfies the physical damage or loss, or are you alleging that there is something more akin to, you know, the damage that is caused by operating a meth lab? So in our complaint, we cite two studies that say that routine cleaning does not remove the coronavirus from surfaces, that the coronavirus bonds with surfaces, creates fomites. Routine cleaning is not enough. There's a study that they did at the New York hospital. We cite that specifically in our complaint. Also, when the virus is in the air, it is, you have to do something about it. It is being continuously reintroduced in that way, and it is not simply a matter of using a Lysol wipe. You simply can't do that with the air. So our contention is that this, our factual pleadings are consistent with the Trutanich standard. However, if there's a question about whether Trutanich should be limited to its facts, we believe that that supports certifying the question to the Oregon Supreme Court, and they can say, what does Trutanich mean and what does Trutanich not mean? And so that's what your allegation or in your complaint, what you're seeking is to recover for the cost of repairing your clinic or remediating your clinic, or you want business losses? Oh, no. Well, I mean, we have coverage for business income losses due to the suspension of operations, and that includes slowdown. My point was we have alleged in our complaint that we incurred extra expense to attempt to remediate, deal with, to mitigate our cost, to lessen the impact. In other words, costs that we incurred so that we did not have to completely shut down and so that we could comply with the scientific guidance as best we could. So I wanted to make it clear that we do allege that in the complaint. It's not simply a case of business income loss. Unless you have other questions, I'll... Thank you. Thank you. I don't think you had five minutes left, so I'll give you a minute. Good morning, Your Honors. Thank you very much. Brett Solberg on behalf of Fireman's Fund. Your Honors, I will try not to retread any ground. I'm going to try to answer the Court's questions directly. I think I've written most of them down. In terms of the California cases, Marina Pacific, Terrar, that were mentioned in the first argument, they're both my cases, so I can speak with a little bit of authority on the procedural history of those cases. Marina Pacific is a purely procedural case. It doesn't say anything about what California's substantive law does or does not do. And, in fact, it went to great lengths to distinguish the California demur standard from this Court's Twombly-Iqbal standard, the plausibility standard, and said essentially that common sense is not part of the California demur standard. Thankfully, common sense is part of the 12b6 standard that this Court has to apply, common sense and judicial experience. Terrar actually affirmed the grant of the demur, and it sent back the case for an opportunity to replead. But if you read that case, you will see that they did not address a futility. We made a futility argument. They did not address the futility argument. That Court just decided that under California, everybody gets, under California procedural law, everybody gets two shakes, two rolls of those dice, and sent it back. And we've yet to see an amended pleading in that case, despite several months having gone by. Is there a claim for physical, actual physical damage in this case? I think we just heard from my honorable colleague here say essentially no. The way these policies typically work is a hailstorm comes, windows get knocked out, the roof gets damaged, a fire happens, somebody in the kitchen, for example, in the first cases, or a piece of equipment at a medical clinic gets short-circuited by an electrical storm, something like that. And they make a claim as an initial matter. They say, hey, my thing got broken somehow, got squashed, burnt, torn, you know, damaged in some way, or was stolen. And we say, okay, great. And we come out and we adjust that loss. And at the same time, they say, well, I used that thing to make money. And so because I don't have that thing anymore while I'm replacing it or repairing it, I can't make money with it. Please give me my business income loss. It's not business interruption loss. It's business income loss, which is an important distinction. And we do that. In all of these cases, and there are thousands of them all around the country, what these plaintiffs all say is either the government order shut me down or I lost business due to the pandemic. And what's missing is that initial triggering step of, okay, what was broken, squashed, torn, burned, whatever. None of these plaintiffs have been able to explain that in a way that makes sense. If you look at the Marina Pacific case from the California Court of Appeal, what they said is we had to throw some stuff away due to COVID. The court took them at their word for the purposes of the demur. But they didn't explain in any way how COVID-19 could possibly have caused them to have to throw anything away. And there's no allegation of anything like this in this case. What Oregon Clinic has pleaded is that we had COVID on our premises and we had to suspend, at least in part, our operations. And then they also mentioned the orders. But in reality, they closed when the orders told them they had to close or they reduced their capacity when the orders said they had to. And they increased their capacity when the orders said that they were allowed to do it. Judge Forrest, you asked about why can't we rely on our understanding of COVID with respect to the lack of a need to repair. This court can absolutely do that. Every circuit in this country has done that, that has addressed this COVID on the premises argument. And it's a majority of them. In addition, the- I have to say, I'm sure you know, I've been on several of these panels and heard these arguments coming out of lots of different kinds of businesses. The medical industry is different than others in terms of, I mean, the level of cleanliness and sanitariness and all of those things is much more heightened in that environment than in a restaurant or in a gym or whatever. So, I mean, I agree with you. I'm not sure that those things are alleged, but this is one industry where it's arguable. Yes, Your Honor, and I would refer the court to, and I forget the name of the case, and I can certainly submit it after oral argument, but the New York Appellate Division addressed that same argument with respect to a case brought by New York's largest- oh, New York Presbyterian, the largest hospital system in New York, who made exactly those same arguments, in that we had to take a lot of extra steps to clean the hospital. And cleaning is not repair as one would understand it in the context of this policy. That's essentially the response to that. What do you do with the argument that your opponent makes about, like, the smoke cases? I'm not sure about methamphetamine, but the smoke cases, I mean, it's a cleaning. It's a significant cleaning, but ultimately it's a cleaning. Smoke does change the physical structure of property, and it tangibly alters property in a way that COVID does not. So the standard that's been applied all over the country is distinct demonstrable physical alteration to property. It's the demonstrable part that COVID doesn't do, or one of the parts that COVID doesn't do, but especially this, and that's what separates it from smoke and from the cat urine cases that we hear so much about across the country and the methamphetamine cases. This damage is very demonstrable. Anyone who's walked into a fire-damaged building will attest to the fact that smoke damages the structure of property. You can smell it. You can tangibly detect the problem. It's the same thing with methamphetamine. In addition to making it dangerous, as Your Honor pointed out in questioning. But is that just a variation? I understand what you're saying, but is that just a variation on the spectrum of these kind of cases, and so shouldn't the Oregon Supreme Court be able to decide for itself? Your Honor, I would not call it a variation on a spectrum. I would say that if it is, it's on the side of the spectrum where the line has been drawn and can be drawn, I think, by this Court. In terms of certification, this Court is well within its discretion, of course, to certify any question of state law that it wants to do. However, I think as we briefed to the Court, I don't think this is appropriate for certification. There have been lots of other courts, lots of other circuit courts, especially in exactly the same situation as this Court, where they're faced with very little in the way of case law because of a lack of domestic insurance companies and so then a lack of state court cases on these issues. And virtually all of them have declined to certify because there's nothing unique about how Oregon approaches the contractual interpretation question here. And this is a contractual interpretation question. It's not a scientific one. It's one of what do the parties mean when they use these words here. There's nothing unique about the way Oregon approaches it compared to California or Washington or Texas, where I'm from, or Illinois or New York or any of the other cases or any of those states in the country. And on that point, maybe I can just take two minutes and address the true and match case, which I can never pronounce, and I apologize. That required, in addition to the demonstrable part, the Truenich case and Western Fire, they required extensive physical remediation here in a way that's just completely different. It's the same with respect to the cat urine case from, I think it was Pennsylvania, which gets a lot of press. That required tearing out property, throwing property away, replacing it. Here we're talking about wiping it down with Lysol. That's a significant difference, and it's one that really matters when it comes to these policies. And they also have a problem, and I think it was touched on in the first argument, with the link, the causal link, right? Because the policy says that the reduction in income has to be due to – that's the words the policy uses – the suspension of your operations caused by, arising from, direct physical loss or damage. And here, even if they can somehow say that on a microscopic, non-detectable, non-demonstrable level, COVID makes some sort of change, they still have to link the actual damage to their business loss during the time that it's being repaired, rebuilt, or replaced, and that's a fundamental thing. And that's essentially the holding of inns by the sea from the California Court of Appeal and this court in some of the non-published cases that followed inns. Let me add, before your time ends, the Oregon cases that you rely on hold that the consequential damages are not recoverable and only damages that relate or resulting from rectifying the problem are recoverable. Does that mean if the Oregon clinic had properly alleged, or in your view, do you think they properly alleged those damages and still aren't able to recover? Or is it possible for them to properly allege those damages in your view and then would only recover for the rectified damage and not the over, I think, $20 million in business loss? So Wyoming sawmills is probably the case that your Honor is referring to. That arose in a little bit different context. It's really a true CF site. It arose in the CGL, the commercial general liability context, and we're not directly relying on that as a pronouncement of Oregon law. What we think that will help the court do is interpret, because the court had to interpret exactly the same words here, direct physical loss or damage to property, and the Supreme Court looked at physical in particular and interpreted physical in the same way as the vast majority of courts. In fact, all, I think, appellate courts across the country have interpreted meaning tangible, touchable, demonstrable, the same way we allege it needs to be interpreted. In terms of the holding of that case, with the distinction between consequential and non-consequential, I don't think that's as important to this case. If they can establish that there is direct physical loss or damage to property and that direct physical loss or damage to property caused their business interruption or their business income loss, they would be able to recover their business income loss. To the extent that that's consequential or not, I don't know, but that would be recoverable if they met all of the other burdens, which they cannot do. Thank you, Your Honor. Thank you very much. I'll give you two minutes. I helped Mr. Solberg over for two minutes, so I'll give you two minutes. Thank you, Your Honor. I want to address somewhat in reverse order Mr. Solberg's comments. First, the Wyoming sawmills case did not involve the same language. It did not involve the phrase direct physical loss or damage. That was a CGL case, and the policy language is different. The context is completely different. As well, the restrictive gloss that some courts have put on Wyoming sawmills was rejected in the Drutanich decision, which came later. Mr. Solberg also addressed the issue of causation. Causation is a quintessential factual dispute. This is not a far-fetched theory that we are espousing here. There was a trial in Houston involving the Baylor Medical Center, another medical facility, in which the jury was presented with this question. Was there a causal link between the presence of the coronavirus in that medical center and business income losses? And the jury found that there was, and awarded Baylor Medical Center, you know, tens of millions of dollars in damages. This is not a far-fetched theory that we're espousing. Mr. Solberg also mentioned a case from New York. Well, the New York Supreme Court has agreed to take up this question in the CRO case. It came up before. What other cases are there out there? Well, we've put in our briefing the Vermont Supreme Court has addressed this question in the Huntington case and found that an allegation of presence of the virus on a shipyard was direct physical loss or damage. In fact, that court said that that was an allegation of physical damage and didn't even need to reach the question of was it direct physical loss and what's the distinction between the two. What's the posture that that decision was made? Was it at a pleading's or was it at an evidence stage? It was at the pleading stage, Your Honor. Mr. Solberg posited that Oregon is not different. I'm not sure how different Oregon is, but I would say that Oregon's Hoffman standard for policy interpretation is more restrictive than the standard used in other states, as well we have an ordinary purchaser standard for review. So I would suggest that that weighs in favor of certifying the question. With regard to the distinction that Mr. Solberg tried to draw between the Marina Pacific and I think he probably also meant to include the Shusha case, very recent case, those are cases from the California Court of Appeals, which were decided on a demur standard. The distinctions made, well, in this court we apply the Iqbal Twombly standard. I would suggest, though, that this is not a matter of common sense or judicial experience. This is a novel, literally a novel coronavirus. As well, as we put in our brief, when it comes to matters of science, the United States Supreme Court has counseled for judicial deference, and as this court said in Henry Gilead Sciences in 2008, common sense and judicial experience standard does not permit a court to ignore plausible scientific allegations. So I would suggest, Your Honors, I know my time is up, that you follow the example set in the Another Planet case and certify the case at the least. Thank you. Thank you very much. Thank you both, Mr. Rowe and Mr. Solberg, for your oral arguments here today. The Oregon Clinic v. Fireman's Fund Insurance Company case is now submitted.
judges: MURGUIA, FORREST, SUNG